**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **SEVEN NETWORKS, LLC** | |
| **Plaintiff,** | **Civil Action No.  2:19-cv-115-JRG** |
| **v.** | |
| **APPLE INC.** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

**PLAINTIFF SEVEN NETWORKS, LLC**
**OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.    Disputed claim terms ...................................................................................................1

    A.    U.S. Patent No. 10,110,534   ("the '534 patent") ...................................................1

        1.    "message" ...........................................................................................1

        2.    "stored" ................................................................................................3

        3.    "receiving/receive a second connection associated with the second device"5

    B.    U.S. Patent No. 9,516,127 ("the '127 patent") .......................................................7

        1.    "optimize" terms .................................................................................7

        2.    "the power save mode is based on a battery level of the mobile device"....9

    C.    U.S. Patent 9,603,056 ("the '056 patent") ...........................................................10

        1.    "backlight" ........................................................................................10

    A.    U.S. Patent No. 10,091,734 ("the '734 patent") ...................................................11

        1.    "block" ..............................................................................................11

    B.    U.S. Patent No. 9,438,550 ("the '550 patent") .....................................................11

        1.    "a predetermined amount" ................................................................11

        2.    "application data request" ................................................................13

    C.    U.S. Patent No. 10,027,619 ("the '619 patent") ...................................................16

        1.    "service activation code" ..................................................................16

    D.    U.S. Patent No. 9,473,914 ("the '914 patent") .....................................................17

        1.    "automatically transmitting".............................................................17

    E.    U.S. Patent Nos. 10,135,771 and 9,712,476 ("the '771 and 476 patents")............19

        1.    "security association"........................................................................19

        2.    "token" ..............................................................................................22

        3.    "receiving a token issued by an intermediary server" ...............................25

        4.    The Preamble of Claims 13 and 23 of the '476 patent ..............................26

F. U.S. Patent No. 9,369,539 ("the '539 patent") ......................................27

 1. "delayed for download" ...........................................................27

G. U.S. Patent Nos. 9,769,176 and 10,243,962 ("the '176 and '962 patents") ..........30

 1. "registration information" .........................................................30

H. U.S. Patent No. 10,039,029 ("the '029 patent") ...................................31

 1. "a mobile device having an established multiplexed connection for optimizing communications" ..................................................31

 2. "established multiplexed connection" .......................................33

 3. "activity session" ....................................................................37

 4. "wherein the data is fetched if the fetching is enabled by the user selection for the application" ...............................................38

II. Processor Terms – the '127, '056, '734, '550, '619, '914, '771, '476, '539, '029, and '986 patents ...............................................................................39

A. Apple's Untimely "Processor" Arguments Are Waived ......................................40

B. Apple's Arguments Are Defective On Their Face ...............................................40

C. Apple Does Not Overcome the Presumption that 112(6) Does Not Apply ..........41

D. The Claims Are Not Indefinite ..............................................................45

III. Conclusion ...............................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Mktg. Sys., LLC v. CVS Pharm., Inc.*,
    2016 U.S. Dist. LEXIS 58472 (E.D. Tex. May 3, 2016)........................................................42

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002).................................................................................26, 32

*Am. Med. Sys., Inc. v. Biolitec, Inc.*
    618 F. 3d 1354 (Fed. Cir. 2010).............................................................................................27

*Amgen Inc. v. Amneal Pharms. LLC*,
    945 F.3d 1368, slip op. (Fed. Cir. 2020)..............................................................................34

*Amgen Inc. v. Sandoz*,
    2016 WL 4137563 (N.D. Cal. Aug. 4, 2016) .........................................................................4

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002)................................................................................................27

*Cellular Communs. Equip. LLC v. AT&T*,
    2016 U.S. Dist. LEXIS 174666 (E.D. Tex. Dec. 18, 2016)...................................................42

*Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*,
    2019 U.S. Dist. LEXIS 79752 (E.D. Tex. May 10, 2019)......................................................42

*EPOS Techs Ltd. v. Pegasus Techs.*,
    766 F.3d 1338 (Fed. Cir. 2014)......................................................................17, 23, 31, 37

*Fisher-Rosemount Sys., Inc. v. Invensys Sys., Inc.*,
    2015 WL 1275910 (W.D. Tex. Mar. 19, 2015) ......................................................................3

*Golden Bridge Tech., Inc. v. Apple Inc.*,
    758 F.3d 1362 (Fed. Cir. 2014)..............................................................................................13

*In re Fought*,
    941 F.3d 1175 (Fed. Cir. 2019)..............................................................................................27

*Kit Check, Inc. v. Health Care Logistics, Inc.*,
    2019 U.S. Dist. LEXIS 148398 (S.D. Ohio Aug. 30, 2019)...................................................41

*Marrin v. Griffin*,
    599 F.3d 1290 (Fed. Cir. 2010)..............................................................................................27

*MasterObjects, Inc. v. Yahoo!, Inc.*,
    2013 U.S. Dist. LEXIS 168296 (N.D. Cal. Nov. 26, 2013)...................................................38

*Mobile Telcoms. Techs., LLC v. Google Inc.*,
    2016 U.S. Dist. LEXIS 174667 (E.D. Tex. Dec. 18, 2016)........................................................6

*Nautilus, Inc. v. Biosig Instruments*,
    572 U.S. 898 (2014)...............................................................................................................38

*Optis Cellular Tech., LLC v. Kyocera Corp.*,
    2017 U.S. Dist. LEXIS 18191 (E.D. Tex. Feb. 8, 2017) ........................................................42

*Panoptis Patent Mgmt., LLC v. Blackberry Ltd.*,
    2017 U.S. Dist. LEXIS 16650 (E.D. Tex. Feb. 7, 2017) ........................................................42

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998)...............................................................................................41

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................................... passim

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)...............................................................................................32

*Positive Techs. Inc. v. Toshiba Am. Consumer Prods., LLC*,
    2008 WL 2627687 (E.D. Tex. July 1, 2008) ...........................................................................3

*Realtime Data, LLC v. Rackspace US, Inc.*,
    2017 U.S. Dist. LEXIS 92131 (E.D. Tex. Jun. 14, 2017).................................................42, 44

*Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*,
    824 F.3d 999 (Fed. Cir. 2016)..................................................................................................9

*Schumer v. Lab. Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002)....................................................................................27, 32, 33

*SEVEN Networks, LLC v. Google*,
    17-CV-00442-JRG, Dkt. 279 ................................................................................................11

*SEVEN Networks, LLC v. Google*,
    No. 2:17-CV-00442-JRG, Dkt. 342 (E.D. Tex. Oct. 23, 2018)................................................1

*Smartflash LLC v. Apple Inc.*,
    2015 U.S. Dist. LEXIS 91669 (E.D. Tex. Jul. 7, 2015)..........................................................42

*Solocron Media, LLC v. Verizon Commc'ns Inc.*,
    No. 2:13-CV-1059-JRG-RSP, 2015 WL 1011310 (E.D. Tex. Mar. 5, 2015) ........................40

*Sonix Tech. v. Publications, Int'l*,
844 F.3d 1370 (Fed. Cir. 2017)........................................................................39

*St. Isidore Research, LLC v. Coamerica, Inc.*
2016 U.S. Dist. Lexis 126866 (Sept. 19. 2016) ...........................................44, 45

*Stambler v. ING Bank, FSB*,
2011 WL 4527648 (E.D. Tex. Sept. 28, 2011) ................................................26

*SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*,
2016 U.S. Dist. LEXIS 677 (E.D. Tex. Jan. 5, 2016)..........................................42

*Teva Pharms., USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)........................................................................21

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. Feb. 1, 2012)............................................................37

*TQP Dev., LLC v. Intuit Inc.*,
2014 WL 2810016 (E.D. Tex. June 20, 2014).................................................7, 11

*Uniloc 2017 LLC v. Google LLC*,
2020 U.S. Dist. LEXIS 9405 (E.D. Tex. Jan. 20, 2020) .......................................6

*Variant Holdings LLC v. Z Resorts LLC*,
2013 U.S. Dist. LEXIS 67943 (E.D. Tex. May 9, 2013).......................................40

*Vitronics Corp. v. Conceptronic*,
90 F.3d 1576 (Fed. Cir. 1996)..........................................................................31

*Wi-LAN, Inc. v. Apple Inc.*,
811 F.3d 455 (Fed. Cir. Jan. 8, 2016) .................................................................6

Plaintiff (herein "SEVEN") respectfully submits this opening claim construction brief in support of SEVEN's constructions of 34 disputed terms.  Several of these terms were construed by this Court in *SEVEN Networks, LLC v. Google*, No. 2:17-CV-00442-JRG, Dkt. 342 (E.D. Tex. Oct. 23, 2018) ("*Google Markman* Order"), which concerned one overlapping patent (the '127 patent) and many related patents to those here.  Apple's constructions contradict the *Google Markman* Order, Apple's positions in IPRs, and the intrinsic evidence.  In addition, for 13 of the 34 terms (the so-called "processor" terms), Apple proposes untimely indefiniteness arguments that were first raised long after Apple's invalidity contentions were due.  *See* Dkt. 83 (SEVEN's Opp. to Mot. to Supp. Invalidity Conts.), Dkt. 90.  After hiding the ball on these arguments until well into claim construction, Apple does not come close to showing "good cause" to add these arguments.  *See* Dkt. 90 at 2-4.  To the extent the Court considers these arguments, they are substantively meritless.  For the reasons below, the Court should adopt SEVEN's constructions.[1]

## I.    DISPUTED CLAIM TERMS

### A.    U.S. Patent No. 10,110,534   ("the '534 patent")

#### 1.    "message"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "message" (claims 1, 11) | "communication" | "communication containing content from a user, such as email data, calendar data, contact information data, task data, notes data, electronic document data, user file data or any other type of data from a user" |

Both parties agree that a "message" is a "communication," but Apple imports further limitations on "message" that contradict the intrinsic evidence.  Jones Decl., ¶¶60-65.  First, Apple's construction contradicts the specification, which teaches that "[t]he trigger may be a

---

[1] The sixteen patents-in-suit are attached hereto as Exs. A-P.  SEVEN attaches declarations from persons having ordinary skill in the art supporting its constructions (referred to as the "Jones Decl.," "Smith Decl.," and "Goodrich Decl.").  SEVEN also submits a technology tutorial.  All exhibits cited herein are attached to the declaration of Kevin Schubert.

<u>message with no payload</u> that simply tells the mobile device that something new has happened in the user's inbox." '534, Col. 7:67-8:3.[2]  A "message with no payload" is not <u>content from a user</u>, such as email data, calendar data…" per Apple's construction.

Second, Apple's construction contradicts the claims.  Claim 1, for example, recites a "first <u>message comprises a data query</u> that is transmitted from the first device for the latest version of the data stored at the second device." '534, Col. 9:67-10:3.  A simple message comprising a data query is not user content, such as email data or calendar data, as improperly required by Apple's construction.  Jones Decl., ¶63.  Nor do the claims or specification require that a "message compris[ing] a data query" even relate to user action.  The specification, for example, teaches that the message comprising a data query may be automatically generated by the device based on filters: "<u>the filters may tell the personal client to send a trigger</u> each time a new email arrives … [t]he trigger may be a message with no payload…" '534, Col. 7:62-8:3. The personal client is described as software/hardware within a PC.  '534, Col. 5:64-67, Fig. 6. Dependent claim 2, which recites that "the first message is received in response to instructions from a user of a first device," further shows by claim differentiation that the first message in claim 1 need not be in response to user instruction.

Third, Apple admits that its narrow proposed construction of "message" here is not the plain and ordinary meaning.  Ex. Q (12/16/19 email).  Yet, in its IPRs, Apple asserts that "message" should carry its plain and ordinary meaning.  Ex. R ('534 IPR) at 5-7.

Fourth, Apple's "content from a user" is terminology that is unclear and not used in the specification.  To the extent the "user" in Apple's construction refers to a "user" of the first device, the data received after a query, such as email data or calendar data, is not "content from a

---

[2] Emphasis has been added to quotations cited herein, unless otherwise noted.

user," except perhaps when a user emails oneself.  The received data may be from any number of sources, such as received emails from any number of third parties or auto-generated sources.

Apple points to the following specification passage: "[A]ny type of email data or email transaction described below can be similarly performed for calendars, contacts, tasks, notes, electronic documents, files or any other type of data that needs to be transferred between a local network and a mobile device."  '534, Col. 2:28-33.  But this passage does not use the term "message," let alone define it.  Rather it provides examplary types of data obtained in an exemplary system.  As noted above, a "message" in the patent may also be i) a "trigger" with no payload or ii) a "data query," neither of which are described in this passage nor are "content from a user, such email data."  Further, this passage does not limit the types of data that may be obtained to "content from a user."

### 2. "stored"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "stored" (claims 1 and 11) | To the extent construction is necessary, plain and ordinary meaning, which is "placed or retained in a device" | plain and ordinary meaning, which is "to leave or keep for future use" |

"Stored" is a well-understood term that needs no construction.  *Positive Techs. Inc. v. Toshiba Am. Consumer Prods., LLC,* 2008 WL 2627687, at *5 (E.D. Tex. July 1, 2008) (holding that "storing" needs no additional construction because it "recites a well-understood function to one of skill in the art"); *Fisher-Rosemount Sys., Inc. v. Invensys Sys., Inc.*, 2015 WL 1275910, at *9 (W.D. Tex. Mar. 19, 2015) (same).  Apple's inconsistent position in its IPRs that "stored" need not be construed shows construction is unnecessary.  Ex. R ('534 IPR) at 5-7.

To the extent the Court construes this term, only SEVEN's construction is consistent with the plain and ordinary meaning of "stored" as shown by multiple technical dictionaries, including those cited by Apple.  Jones Decl., ¶54-59.  For example, Apple cites the IEEE Dictionary,

Seventh Edition (2000), which defines "store" as "[t]o place data into a device" or "[t]o retain data in a device."  Ex. S at 1113.  Thus, "stored" means "placed or retained in a device," as SEVEN proposes.  The '534 patent claim language is "data stored," which is "data placed or retained in a device."  Col. 9:67-10:3; 10:50-53.  Apple also cites the Modern Dictionary of Electronics, Seventh Edition (1999), which defines "store" as "to introduce information into the device," consistent with SEVEN's construction.  Ex. T at 739.

SEVEN's construction is also consistent with the intrinsic evidence.  Jones Decl., ¶57-58. For example, the patent teaches that "Fig. 5 is a block diagram showing how <u>data is stored in a mobile device</u>" and that "[t]he mobile client 98 can <u>store</u> the last received contact list portion 112 in memory."  '534, Col. 2:19-20, 7:36-37.  The specification teaches that data is "stored," or "placed or retained in a device" such as the mobile device, when, for example, the contact list portion is received from a PC over a network and placed or retained in the mobile device.  '534, Fig. 5, Col. 7:36-37, Jones Decl., ¶57-58.

Apple's construction, putting aside its incorrect tense, narrowly construes "stored" to mean "to leave or keep <u>for future use</u>."  None of Apple's extrinsic technical dictionaries define the term so narrowly.  In addition, Apple's "for future use" improperly imports a purpose or intent requirement into the meaning of "stored."  *Amgen Inc. v. Sandoz*, 2016 WL 4137563, *10 (N.D. Cal. Aug. 4, 2016) (rejecting attempt to read "for purposes of stem cell mobilization" into a term because "there is no textual basis to import a purpose limitation into the claim).  Just because data is "stored" does not mean it has to be "for future use."  Ex. U (Jones Depo) at 66:7-15, 68:16-69:23.  Data can be stored on a device regardless of whether there is "future use."  For example, a picture is "stored" on a phone regardless of whether anyone ever looks at it again.  It is also "stored" regardless of whether it is thereafter deleted.  To the extent Apple's "future use"

is trying to carve out data that is "temporarily" stored, Apple's own experts in IPRs have opined that this type of data is covered by the '534 patent.  Ex. V (12/5/19 Tittel Decl.) at 24 (stating that "stored" within the context of the '534 patent covers data "temporarily stored.").

Apple provides no expert testimony for this term and relies predominantly on a non-technical dictionary, *Merriam-Webster's*, that has one general definition of "store" as "something that is stored or kept for future use."  Ex. W at 1156.  But this dictionary defines "store" in a computer context as "to place or leave in a location (as a warehouse, or library, or computer memory) for preservation or later use or disposal," consistent with SEVEN's construction (i.e., "to place or leave in a location" is similar to "placed or retained in a device.").  *Id.*  Apple also cites the *New Oxford American Dictionary*, which provides one general definition of "store" as "a place where things are kept for future use or sale: a grain store."  Ex. X at 1679.  But this non-technical dictionary does not define "stored" in a technical context.

### 3.    "receiving/receive a second connection associated with the second device"

| Claim Term: | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "receiving/receive a second connection associated with the second device" (claims 1, 11) | The claims require an order such that "receiving/receive a second connection associated with the second device" is after "generating/generate a second message for a second device…" | Plain and ordinary meaning, which is "receive a second connection, where that second connection is associated with the second device" |

The "receiving/receive" element must follow the "generating/generate" element in the claims.  An order to these elements is consistent with the antecedent basis:

> generate [generating] a second message for **a second device** based on the first message from the first device;
> send the second message to the second device;
> receive [receiving] a second connection associated with **the second device**,

'534, claim 1 (Col. 9:55-59); claim 11 (Col. 10:37-41).

Courts apply a two-part test to determine if a particular order of steps of a method claim,

like claim 11, are required: first courts determine "if, as a matter of logic or grammar, they must be performed in the order written," and "[i]f not, we next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Mobile Telcoms. Techs., LLC v. Google Inc.*, 2016 U.S. Dist. LEXIS 174667, at *56 (E.D. Tex. Dec. 18, 2016). When claim elements rely upon a preceding element, as a "matter of logic and grammar," the steps "must be performed in the order recited." *Id.* (finding that step (b) must follow step (a) because step (b) relies upon "the" messages in step (a)); *see also Uniloc 2017 LLC v. Google LLC*, 2020 U.S. Dist. LEXIS 9405 (E.D. Tex. Jan. 20, 2020) ("Step (a) provides 'the device fingerprint' recited in step (b) and 'the requesting location' recited in step (c), and therefore, logically, step (a) must precede steps (b) and (c)."). Because the "receiving" step has antecedent basis in the "generating" step, these elements require an order.

Apparatus claims, such as claim 1, likewise require an order when the claim language uses antecedent basis to refer to earlier elements. For example, in *Wi-LAN, Inc. v. Apple Inc.,* 811 F.3d 455, 462 (Fed. Cir. Jan. 8, 2016), the Federal Circuit required an order to a claim with elements "produce modulated data symbols" and "combine **the** modulated data symbols" because the "text of the claim thus requires producing randomized symbols and then combining those randomized symbols."

While the antecedent basis in the claims is dispositive of an ordering requirement, the '534 specification is also consistent with the ordering of these elements. The specification teaches that a server may generate a "trigger" ("second message") for a second device, which causes the second device to initiate a connection with the server. Thus, the specification teaches that the server "generat[es] a second message" and subsequently "receiv[es] a second connection associated with the second device." For example, the specification teaches that "[i]f a new email

6

is detected, the personal client sends a <u>trigger</u> to the mobile device through the management server … [t]he <u>trigger causes the mobile device to establish the mobile connection with the management server</u>." '534, Col. 7:64-8:6.   Therefore, the specification is consistent with the ordering in the claims (i.e., that the "receiving/receive" element follows the "generating/generate" element).

**B.     U.S. Patent No. 9,516,127 ("the '127 patent")**

**1.     "optimize" terms**

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "optimize background traffic" (claims 33, 42) | "adjust background traffic to conserve network or mobile device resources" | "schedule background transmissions in a manner that results in the conservation of network or mobile device resources as a result of the transmissions" |
| "receive a selection from a user whether to optimize traffic" (claims 33, 42) | "receive a selection from a user whether to adjust traffic to conserve network or mobile device resources" | Apple proposes construing "optimize traffic" separately.  Separate from that, this term needs no further construction |
| "optimize traffic" (claims 24, 33, 42) | "adjust traffic to conserve network or mobile device resources" | "schedule transmissions in a manner that results in the conservation of network or mobile device resources as a result of the transmissions" |

SEVEN proposes the Court's prior constructions.  Apple asks this Court to depart from its prior constructions and import improper limitations from the specification into the claims. *Google Markman* Order at 28.  This Court has also held that "previous claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so." *TQP Dev., LLC v. Intuit Inc.*, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014).

Apple's construction improperly requires that optimization be performed by scheduling transmissions.  Although the patent teaches that transmissions may be optimized through scheduling, it teaches many other methods to optimize traffic.  Goodrich Decl., ¶80; '127, Col. 10:59-11:17.   For example, the patent teaches optimization by using compression and

transcoding at either end of a network connection, reducing the total volume of traffic.  '127, Col. 11:1-4.  This optimization is independent of scheduling, and would tend to either shorten transmissions or permit transmission of more data.  The patent also teaches caching and storing data for future requests and filtering data, which would avoid traffic altogether.  '127, Col. 10:59-11:1.  Data that is filtered at the server or cached at the client would not be scheduled. This optimization would not be covered under Apple's construction, improperly excluding embodiments from the claims.

The patent teaches other optimizations resulting from *not* scheduling transmissions.  For example, the patent teaches accumulating low-priority data so that, when resources are used to send or receive high-priority data, the low-priority data can be sent or received without incurring additional overhead.  '127, Col. 11:8-17.  This kind of optimization directly contradicts the "scheduling" limitation Apple reads into the claims—it conserves device and network resources by *not* scheduling data for transmission but, instead, sending it opportunistically as conditions warrant.  Apple's construction improperly excludes these optimizations from the claims.

Apple's construction also improperly requires that the scheduling of transmission "result in the conservation of network or mobile device resources as a result of the transmissions."  First, the claim term to be construed is "traffic" which is not limited to transmissions.  Goodrich Decl., ¶82.  Second, the '127 patent teaches conservation of resources resulting from avoided or consolidated traffic.  For example, the filtering optimization above would conserve resources by not making transmissions at all.  The transcoding optimization referenced above could reduce the duration of a transmission or allow more data (e.g., a higher quality image) be sent at the same transmission cost.  The opportunistic transmission optimization above would result in the same transmissions, but would defer them until the radio was already active, conserving device

resources by not requiring the mobile device's radio to power up a second time.  Limiting the "optimize" terms by requiring that the claims conserve resources by making transmissions would improperly exclude these embodiments.

### 2.    "the power save mode is based on a battery level of the mobile device"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "the power save mode is based on a battery level of the mobile device" (claims 24, 33, 42) | No construction necessary | the ability to enter power save mode depends upon the battery level of the mobile device |

No construction is necessary for this plain English phrase.  Apple's construction seeks to rewrite the claims to import limitations into the claims that are not taught in the specification. Apple can point to no intrinsic record support for its construction—in fact Apple's expert argues that the construction he urges *lacks* written description in the specification.  Ex. Y (Wicker) at ¶88.  Apple's erroneous construction should be rejected.  *Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824 F.3d 999, 1003 (Fed. Cir. 2016) ("Legal error arises when a court relies on extrinsic evidence that contradicts the intrinsic record.").  Apple's construction also contradicts Apple's IPR position where it argues no construction is necessary for this term.  Ex. Z ('127 IPR Pet 1) at 6; Ex. AA ('127 IPR Pet 2) at 12.

The patent discloses and describes an intelligent alarm manipulator and resource tracker module that tracks and optimizes resources used on a mobile device.  '127, Fig. 2, Col. 13:14-20. The patent further teaches that the intelligent alarm manipulator and resource tracker can have a "mode selector" that can "turn on or off the optimization of resource usage via intelligent manipulation of the alarms/timer across multiple applications" in response to a user selection. '127, Fig. 2, Col. 18:14-20.  In other words, the power save mode can be turned on or off by a user selection.  The '127 patent then explains that "the mode selector can be configured to turn on the resource optimization by default when on battery power" or "may be operational

regardless of whether the device is charging or on battery." '127 Col. 19:6-14.  In other words, the ability to enter the power save mode need *not* depend on a battery level.

Contrary to Apple's proposed construction, the '127 patent teaches that its power save mode may be "based on a battery level" without requiring that the "ability to enter power save mode" depend upon the battery level.  Goodrich Decl., ¶95.  For example, the patent teaches that the behavior of the power save mode can change when the battery level crosses certain thresholds.  *Id.*  This includes the intelligent alarm manipulator "manipulating the timing of some of the triggers to prevent the triggers from firing off when … the battery level is below a threshold." '127, Col. 18:41-44.  This "manipulating" could only occur when the alarm manipulator was operational, i.e., when the power save mode was on.

Apple's proposed construction would improperly excludes this embodiment, and require a feature that Apple's expert contends is not even taught by the patent.  Ex. Y (Wicker) at ¶88-91. Apple's expert cites provides no analysis that would require this extraordinary result.  The Court should disregard Dr. Wicker's opinion.  *See Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.")

## C.    U.S. Patent 9,603,056 ("the '056 patent")

### 1.    "backlight"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "backlight" (claims 1, 4, 10, 13, 19) | "an illumination device that provides light behind a viewing surface" | "an illumination device that provides light behind a non-emissive display" |

The parties' respective proposed constructions for "backlight" in the '056 patent correspond to the proposed constructions of "backlight" for U.S. Patent Nos. 9,516,127 and 9,516,129 in the *Google Markman* Order, wherein the Court essentially adopted SEVEN's proposal.  *Id.* at 10-14, 36-37, 44-45.  The parties desire to reduce burden on the Court and the parties, such that the Court may re-enter its prior ruling on this term without additional argument

10

here, while allowing the parties to preserve their positions for appeal.  Thus, the parties respectfully request that the Court deem incorporated by reference herein the arguments and evidence previously presented regarding "backlight."[3]

### A.     U.S. Patent No. 10,091,734 ("the '734 patent")

#### 1.     "block"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "block/blocking/blocked" (claims 1, 9) | "prevent/preventing/prevented" | Plain and ordinary meaning |

SEVEN requests that the Court adopt its prior construction for this term from a related patent (U.S. Patent No. 9,516,129) that used the term in substantially the same context.[4]  As noted above, previous claim constructions "are entitled to substantial weight" and should not be departed from "absent a strong reason for doing so."[5]  As the Court previously found, its construction is supported by both the surrounding claim language and extrinsic technical dictionary definitions.[6]  Thus, the Court should construe the term again to mean "prevent."

### B.     U.S. Patent No. 9,438,550 ("the '550 patent")

#### 1.     "a predetermined amount"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "a predetermined amount" (claims 1, 15, 32) | "a preset threshold" | "a preset threshold for entering and exiting low power mode" |

Apple's limiting phrase "for entering and exiting low power mode" is improper for several reasons.  First, Apple contradicts the claims, which provide that the threshold can be different for exiting low power mode than for selecting one of the power management modes.

---

[3] *See SEVEN Networks, LLC v. Google,* 17-CV-00442-JRG, Dkt. 279 (Reply Br.) at 1; *id.*, Dkt. 263 (Am. Resp. Br.) at 1-2; *id.,* Dkt. 208 (Resp. Br.) at 1-2; *id.*, Dkt. 191 (Open. Br.) at 1-11, and all evidence cited therein.

[4] *Google Markman* Order (*compare* the '734 patent *with* the '129 patent claims that both recite "block transmission of outgoing application data requests").

[5] *TQP Dev.*2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (emphasis added).

[6] *Google Markman* Order at 39-40.

Claim 15, for example, recites "selection of a <u>power management mode</u> based on the amount of battery remaining being <u>below a predetermined amount</u>."   '550, Col. 10:64-11:2.   The "selection" element is not limited to low power mode—in fact the patent discloses a "medium" mode when the battery is below 50% and a "low" mode below 20%, for example.   Ex. BB ('249 prov. app) at 20; '550, Col. 1:19-22 (incorporating the '249 into the '550 specification).   Either the "medium" or "low" mode, for example, may be selected based on a battery level being below a "predetermined amount."   In addition, the specification discloses other modes, including one above 75% with synchronization every 5 minutes, a second below 75% with synchronization every 10 minutes, and a third with synchronization every 30 minutes.   '550, Col. 9:10-20.   Thus, the "selection" element may be met by selecting either the second or third modes.

Further, the claims recite "selecting a power management mode … based on the amount of battery power remaining being below <u>a predetermined amount</u>" and "exiting the low power mode when an amount of battery power remaining is above <u>a predetermined amount</u>."   *See, e.g.*, '550, claim 1 (Col. 9:59-10:14), claim 15 (Col. 10:64-11:21).   The claims thus have separate elements for "selecting" and "exiting," and do not require that the "predetermined amount" related to the selecting must be the same battery level or relate to the same mode as the exiting.   For example, the "selection" element may relate to the second mode noted above (with "a predetermined amount" being 75%) and the exiting may relate to the third mode noted above (with "a predetermined amount" being 50%).   '550, Col. 9:10-20.   In other words, limiting the "predetermined amount," as Apple proposes, to only "low power mode" and one power level not only contradicts the claims, it also reads out embodiments in the specification.

Only SEVEN's construction is consistent with the plain and ordinary meaning of the term, and there is no reason to import Apple's limitations.   Jones Decl., ¶24-28.   SEVEN never

redefined "predetermined amount," a common term which means a "preset threshold," nor did it disclaim claim scope, and "[c]laim terms are generally given their plain and ordinary meanings." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014).

Apple's construction takes claim language from miscellaneous claims and imports that language into every claim.  Apple has pointed to unasserted dependent claims 3 and 19, which state that "the predetermined amount is 75% of battery charge."  '550, Col. 10:25-26.  However, these claims merely recite one embodiment.  In other embodiments, the predetermined amount in the "select" element may be 75% and the predetermined amount in the "exit" element may be 50% as the claims and specification teach, as discussed above.

Apple also points to independent claim 32, but this claim recites different claim language than claims 1 and 15.  The "select" element of claim 32 is limited to low power mode (i.e., "select a low power mode"), not any mode as in claims 1 and 15.  In addition, the "exit" element of claim 32 refers back to "the predetermined amount" not "a predetermined amount" in claims 1 and 15.  Regardless of whether "the predetermined amount" in claim 32 must be the same for the "select" and "exit" elements, the language in claim 32 should not be imported into other claims. If anything, the differing language supports SEVEN's construction.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms").

## 2.    "application data request"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "application data request" (claims 1, 4, 15, 20-21, 32) | plain and ordinary meaning, which is a "request for application data" | plain and ordinary meaning, which is a "request for data initiated by an application" |

Apple's construction imports the limitation "initiated by an application," which contradicts the intrinsic evidence and plain meaning of the term.  Jones Decl., ¶19-23.

First, the independent claims, such as claim 15, recite a "processor configured to allow the mobile device" to "send application data requests to a host over a first connection at a first frequency" and "change the frequency that application data requests are sent."  The claims thus recite a processor configured to allow the <u>mobile device</u> (not an "application") to send application data requests and change the frequency of those requests.

Second, the patent teaches that the mobile device has power management modes "configured to allow the <u>mobile device</u> to send application data requests less frequently on weekends than on weekdays" (dependent claim 17) and "uses charge gradient levels for determining how often to send application data requests" (dependent claim 16).  Likewise, the specification teaches that requests for application data may be sent following user action, at a frequency (e.g., "every 5 minutes"), or based on an event (requests sent "less often on weekends").  '550, Col. 7:27-34, 9:1-24.  Application data requests are not limited to requests "initiated by an application" but rather may be sent by the mobile device based on, for example, whether it is a weekend or the battery level.

Third, the patent only uses "initiate" in the context of the mobile device, not the application.  Jones Decl., ¶21.  For example, the patent teaches that "[t]he <u>mobile device</u> 21 can periodically <u>initiate</u> synchronization according to an amount of change remaining in a battery 123."  '550, Col. 9:2-4.  "Synchronization" is a request for application data.  Col. 2:29-34; Jones Decl., ¶21-22.

Fourth, the patent teaches that "the <u>mobile device</u> periodically sends out synchronization requests….The personal client 40 generates a response 133 pursuant to the synchronization request 134 that contains the latest emails, or other local user data."  '550, Col. 7:55-57.  The "other local user data" may be, for example, "calendar" or "contacts" data.  '550, Col. 2:29-34;

14

Jones Decl., ¶22.  Apple restricts "application data request" to a "request for data initiated by an application" when the patent teaches that the mobile device initiates a synchronization request ("application data request") for obtaining data not be tied to any particular application.  '550, Col. 2:29-34; Jones Decl., ¶21-22; *see also* Ex. BB ('249 prov. app) at SEVEN_APPLE-09483 ("System SEVEN delivers mobile access to the following applications … Email … Calendar … Contacts."), *Id.* at SEVEN_APPLE-09604 ("Scheduled syncs apply to <u>all accounts</u>.").

Apple's expert makes two arguments in support of Apple's construction.  Specifically, he cites *Newton's Telecom Dictionary* definitions of "application" as "[a] software program that carries out some useful task" and "request" as "[t]he formatted information that is sent to the switching domain as a result of a computing domain issuing a service across the service boundary."  Ex. CC (Porter) at ¶55.  He then mashes these definitions together and concludes that "an application carries out a task, i.e., requests data, and a request is what is transmitted." *Id.*  But regardless of whether it is possible for an application to send a request, there is no basis to use these two separate definitions to argue that, in the context of the patent, an "application data request" can only be made by an application.  Moreover, an application can perform thousands of tasks (e.g., a calculator app may compute a number) but it need not request data.

Second, Apple's expert argues that because the Applicant amended the term "transaction" to "application data requests" in the prosecution history, he elected "to not claim data requests initiated by the user (which included user requests) and instead limit[ed] the claim to data requests initiated by applications."  Ex. CC (Porter Decl.) at ¶50-55.  But the amendment unremarkably narrowed the claims from a "transaction," which broadly may be any message (e.g., an "acknowledgement message") that does not necessarily request any data (let alone application data), to "application data requests" that request application data.  Ex. U (Jones depo)

at 23:25-25:17 (SEVEN's expert confirming "transaction" is not limited to a request for data). Further, as discussed above, the specification teaches that the mobile device, as opposed to the application, initiates the requests.  '550, Col. 9:1-4, 7:53-59, 9:52-10:14.

### C.       U.S. Patent No. 10,027,619 ("the '619 patent")

#### 1.       "service activation code"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "service activation code" (claims 22, 37, 51) | "code relaying information used to register a remote device for access to a messaging account" | "code relaying information used to authenticate a user's access to a messaging account" |

The parties dispute whether the "service activation code" must be used to "<u>authenticate a user's access</u> to a messaging account" as set forth in Apple's construction or whether it must merely be used to "register a remote device for access to a messaging account."  Nothing in the claims, specification, or file history supports importing Apple's limitation.  To the contrary, the evidence confirms that the "service activation code" is used to "register a remote device for access to a messaging account," and that authentication is a separate and independent process.

First, the claims confirm that the "service activation code" is used to "register a remote device for access to a messaging account":

> 37. A method for sharing a messaging account, the method comprising:
>
> authenticating a device for access to the messaging account;
>
> optically **receiving information including a displayed service activation code** from a remote device;
>
> <u>**registering the remote device for access to the messaging account** using the service activation code</u>;
>
> …

Nothing in the claims suggests that the "service activation code" is used to "authenticate a user's access" as proposed by Apple.  Rather, authentication is recited in claim 37 as a separate and independent process that involves authenticating a device ***prior*** to receiving the service activation code.  Smith Decl., ¶38-39.

16

Second, nothing in the specification suggests that the "service activation code" must be used to "authenticate a user's access."  Apple's expert admits that the "specification does not expressly define the term."[7]   Moreover, in the context of Figure 2, the patent describes the "Authentication" in step 2-2 as separate and independent from the use of the "service activation code."  '619, Col. 4:56-5:8; Smith Decl., ¶38-39.  In Figure 2, the "Authentication" in step 2-2 occurs at the host system 100 before the "service activation code" is conveyed from the mobile terminal 102 to the host system 100 via a secure channel in step 2-3.  *Id*.  Thus, Apple attempts to import a limitation that is not even included in—and therefore would exclude—the preferred embodiment.[8]

Finally, nothing in the file history suggests that the "service activation code" must be used to "authenticate a user's access."  Rather, the file history confirms that the "service activation code" is used to "register a remote device for access to a messaging account."  Smith Decl. ¶ 36-37.  Indeed, even Apple's expert admits that "the prosecution history demonstrates that the 'service activation code' is a code relaying information (e.g., user name and password) **used to register a remote device to a messaging account**…."  Ex. Y (Wicker) at ¶143.  Apple's expert fails to provide any support from the file history for Apple's construction─rather, he simply replaces the words from the file history discussing the registration process with Apple's construction regarding authentication, which is not addressed in the file history.  *Id*.

## D.     U.S. Patent No. 9,473,914 ("the '914 patent")

### 1.     "automatically transmitting"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "automatically | plain and ordinary meaning; to the extent | "sending content |

---

[7] Ex. Y (Wicker Decl.) at ¶141.

[8] *EPOS Techs Ltd. v. Pegasus Techs.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) ("[A] claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support.").

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| transmitting" / "automatically transmitted"<br><br>(claims 1, 11, 21, 27) | construction is necessary: "sending content automatically (e.g., according to a user preference setting) as opposed to in response to a user selection of the content available from the content provider" | without a user indicating a desire to receive the download" |

The term "automatically transmitting" is used in the intrinsic record consistent with its ordinary meaning.  Apple's expert admits that the "patent specification does not expressly define the term."  Ex. Y (Wicker Decl.) at ¶34.  And there is no disclaimer or lexicography in the file history that would justify limiting the term to Apple's vague construction.  Accordingly, no construction is necessary.  To the extent the Court deems construction necessary, the Court should adopt SEVEN's construction which is directly supported by the claims and specification.

"[T]he claims themselves provide substantial guidance as to the meaning of" the term.  *Phillips*, 415 F.3d at 1314.  Claim 1 juxtaposes "automatically transmitting" with "in response to a user selection of the content available from the content provider":

> 1. A method comprising:
>
> receiving a unique authentication token from each of a first device and a second device;
>
> transferring to a content selection interface on the first device an indication of content available from a content provider;
>
> **transmitting selected content to the first device <u>in response to a user selection of the content available from the content provider</u> at the first device**;
>
> **<u>automatically transmitting</u> the selected content to the second device**,
> ...

Claim 1 recites a method comprising several steps for providing content to a first device and a second device.  First, the claim recites "transferring to a content selection interface on the first device an indication of content available from a content provider."  This step provides the user of the first device an indication of available content using a content selection interface.  Second, the claim recites "transmitting selected content to the first device in response to a user selection of

the content available from the content provider at the first device."  In this step, the user ***selects***

***content*** available from the content provider using the content selection interface.   Third, the

claim recites "automatically transmitting the selected content to the second device." In this step,

the user ***does <u>not</u> need to make any selection*** of the content on the second device because the

content is instead automatically transmitted to the second device.   Thus, a POSITA would

understand the claim juxtaposes "automatically transmitting" with "in response to a user

selection of the content available from the content provider" as set forth in SEVEN's proposed

construction.  Smith Decl., ¶19-20.  In addition, the specification explains that the content may

be transferred "***automatically according to a user preference setting***."  '914, Col. 12:48-49.

Thus, SEVEN's construction is taken directly from the claims and specification.

In contrast, Apple's vague and ambiguous construction would only confuse the jury

because it is unclear what is meant by "indicating a desire."  Apple's construction is not based on

the description in the claims or specification, but instead quotes language from a prior art

reference that is divorced from the context of the claims. Apple relies on a quote from the

Hayashi reference cited in the file history, but there is no disclaimer or lexicography that justifies

Apple's construction.  Smith Decl., ¶23-24.  The file history distinguished Hayashi based on the

ordinary meaning of "automatically downloading."   Therefore, the Court should adopt the

ordinary meaning of the term as set forth in the claims and specification.

**E.**     **U.S. Patent Nos. 10,135,771 and 9,712,476 ("the '771 and 476 patents")**

**1.**     **"security association"**

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "security association"<br><br>('476, claims 1, 8, 13, 20, 22-23, 30, 32-33, 40; '771, claims 2-3, 10, 15-16, 22, 27) | "information enabling encrypted or clear communications between two end points" | "a cryptographic ciphersuite including an encryption cipher, key length, and digital signature algorithm and a unique encryption key enabling secure communication between two end points" |

19

The parties agree that "security association" is information enabling communication between two end points.  Apple's construction is overly narrow in two respects.

First, Apple's construction reads out the "clear" security association from the specification, which does not require encryption or Apple's "ciphersuite" specifics.  The specification describes three security associations—clear, point-to-point, and end-to-end: "the items in each channel are associated with **predefined security associations: clear, pp, and ee**." '476, Col. 7:31-35, 7:63-66.  "Clear" is not encrypted, while "pp" and "ee" are encrypted: "[a]ny items that do not require encryption are assigned to the data channel labeled 'clear.'  Items requiring the use of point-to-point encryption are assigned to data channel 'pp' … Items requiring end-to-end encryption are assigned to the 'ee' channel." '476, Col. 6:62-7:4.  Only SEVEN's construction covers both the clear and encrypted security association embodiments.

Second, Apple's imported limitation "ciphersuite including an encryption cipher, key length, and digital signature algorithm and a unique encryption key" is not required.  The specification teaches that security associations can either be negotiated or predefined.  *Compare* '476, Col. 2:64-3:20 ("The personal client … *negotiates* a security association") with Col. 7:32-35 ("In this example, the items in each channel are associated with *predefined* security associations: clear, pp, and ee.").  Apple's construction imports into the construction of "security association" certain language from one example of a negotiated security association that specifies "a cryptographic ciphersuite (including encryption cipher, key length, and digital signature algorithm) and a unique, secret point-to-point encryption key." '476, Col. 2:65-3:3.  Even assuming the specification taught that negotiated security associations must have Apple's requirements, which it never does, the specification in any case never describes a "predefined" security association as having these requirements.  In fact, it teaches the opposite.  When it

demonstrates the use of a predefined security association, the specification merely discusses whether or not to encrypt data and does not show, for example, use of a digital signature algorithm, a key length, a unique encryption key, etc. '476, Col. 7:28-8:33; Jones Decl., ¶48-49. Apple's attempt to import language from what is expressly disclosed as "one embodiment" (i.e. the Figure 1 embodiment ('476, Col. 1:23-27)), while ignoring other embodiments, fails.

Additional intrinsic evidence further shows that Apple's narrow "ciphersuite" limitations are not required.  For example, claim 20 of U.S. Patent No. 8,127,342, a parent to the '476 and '771 patents, recites a "security association" and dependent claim 22 further narrows this term to "specif[ying] a cryptographic algorithm or a cryptographic key length":

> 20.  A mobile device for secure communications in a mobile network, the mobile device comprising:
>     A processor configured to, associate a data type of an item with a <u>security associations</u>;
>         …
> 22.   The mobile device of claim 20, wherein the <u>security association specifies a</u> <u>cryptographic algorithm or a cryptographic key length</u>."

'342, Col. 14:1-14.  This evidence further shows that "security association" need not specify a "digital signature algorithm" (i.e. a cryptographic algorithm) nor a "key length." *Teva Pharms., USA, Inc. v. Sandoz, Inc.,* 789 F.3d 1335, 1343, n. 5 (Fed. Cir. 2015) ("[P]ast and future prosecution of related patents may be relevant to the construction of a given claim term.").

Finally, Hawkes (U.S. Patent No. 7,352,868), cited on the cover of the '476 and '771 patents, also teaches that "security association" does not require Apple's narrow "ciphersuite" requirements: "IPSec utilizes 'security associations' to describe the parameters, such as the encryption key and encryption algorithm, used to encrypt and/or authenticate communications between a group of entities." Ex. DD (Hawkes) at Col. 10:58-63.  Hawkes further teaches that a "security association" may be stored as merely a key and a value used to compute the key.  Ex.

DD at Col. 20:3-11, 9:66-67; Jones Decl., ¶52.  This intrinsic evidence further shows Apple's "ciphersuite" limitations, such as a "digital signature algorithm," are not required.

          **2.**    **"token"**

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "token" ('771, claims 1, 4-7, 11-14, 17-20, 23-26, 28-30; '476, claims 1, 11-13, 23, 33, 43-44) | "created identifier comprising a unique string of data" | "data representing user validation" |

A "token" is a "created identifier comprising a unique string of data."  For example, the specification illustrates an exemplary token as "abc" or "abcabc."  '476, Col. 6:6; Ex. EE ('881 prov. app.) at SEVEN_APPLE-09379.  Similarly, the contemporaneously-filed specification of the '176 and '962 patents-in-suit, recites an "identifier may include a unique string of data (a token)."  '176, Col. 4:20-24; '962, Col. 31-35.  Apple does not appear to dispute that a token is a "created identifier comprising a unique string of data."  Ex. FF (Houh) at ¶58-74.  Apple's expert's only complaint with SEVEN's construction of "token" is that it "does not identify what the token is an identifier of," incorrectly asserting that "the specification makes clear that the token identifies user validation."  Ex. FF (Houh) at ¶73.

Apple's construction is wrong for several reasons.  First, a "token" does not necessarily "identif[y] user validation."  The claims, for example, recite that the "token provides transaction routing information."  *See, e.g.*, '476, claim 1.  The patent likewise teaches that the token may be a unique identifier providing transaction routing information, such as identifying a particular connection over which to route the data: "When a front end authentication request comes in, the connection list is searched for a connection that has credentials matching those of the authorization request.  The returned authToken is a <u>direct key to a particular connection</u>.  The connection is not in fact reserved at that time – it is acquired on every call (the <u>authToken only identifies which connection</u> the front end request has access to)."  Ex. EE ('881 prov. app) at

SEVEN_APPLE-07998; '476, Col. 1:34-30 (incorporating the '881 into the specification), '771, Col. 1:32-38 (same).

Second, the specification also discloses a token may identify "sync state," which is a created, unique identifier of the final sync state of the mobile device after synchronizing data with a server.  Jones Decl., ¶32.  This token has nothing to do with "user validation."  Jones Decl., ¶32.  For example, the specification describes: "[w]hen a sync is completed, one end-point creates a sync token, which is an opaque key [a unique string of data] that represents the final sync state."  Ex. EE ('881 prov. app) at SEVEN_APPLE-09685; *see also id.* ("[A] new sync token is created to represent the new sync state.").  Apple's construction limiting a token to "user validation" reads out embodiments both claimed and disclosed that a token may be an identifier for other purposes (e.g., routing, sync state, etc.) and cannot be correct.  *EPOS Techs,* 766 F.3d at 1347 ("[A] claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support.").

Third, Apple's construction contradicts the prosecution history.  Both the Applicant and the Examiner understood "token" not to be limited to "user validation."  For example, the primary reference the Examiner used in the '771 prosecution history to initially reject the claims was Noam, U.S. Patent No. 7,203,657.  Ex. GG (4/4/18 Non-Final OA) at 7.  Noam teaches "payment tokens" (Col. 4:55-58), which are "denominated at multiple units that can be drawn down like a debit card."  Ex. HH (Noam) at Col. 5:25-31.  These tokens are created identifiers comprising a unique string of data: "creating a string of digital signals known as an access token."  *Id.* at Col. 9:12-16.  The Applicant never distinguished the claimed "token" from Noam's "token," further showing Apple's narrow construction is not correct.

Fourth, other intrinsic evidence from the specification shows "token" is not limited to

"user validation."  The specification uses the term "auth_token" when referring to a preferred embodiment, showing the term "token" is not equivalent to the term "auth_token."  '771, Col. 7:6-8.  Moreover, even if the claimed "token" were limited to an "auth_token," Apple's construction would fail.  An "auth_token" may be used to identify and authenticate a transaction, determine where to route the transaction, or both.  For example, in one embodiment, "[t]he management server 28 uses the auth_token to identify and authenticate the source of each transaction and to determine where to route the transaction."  '771, Col. 6:29-32.  Dependent claims recite both embodiments—dependent claim 5 states that the "intermediary server identifies and authenticates the transaction message based on the token" while dependent claim 6 states that the "token provides transaction routing information."  '771, Col. 12:33-38.  Other claim language is consistent.  For example, independent claim 23 of the '476 patent recites a token as included in control data that "provides <u>authentication</u> of a source of the transaction" while independent claim 33 of the '476 patent recites that the "token <u>provides transaction routing information</u>."  Thus, the claims place the token in the context of what it identifies (e.g., authentication of a transaction, transaction routing information, etc.).

Apple relies on the following passage: "[t]he server issues the mobile device an auth_token after successfully validating the username and password against information in the user database."  '771, Col. 6:25-27.  But this passage never states that the auth_token represents "user validation."  In fact, the surrounding disclosure suggests, at best, that in this "example" the token may authenticate the "mobile device" (or "source").  '771, Col. 6:21-25 ("For example, the <u>mobile device</u> may be required to authenticate to the management server…"), Col. 6:29-32 (the auth_token may be used to "identify and authenticate the <u>source</u> of each transaction…").

Finally, Apple's expert argues that the specification's teaching of a "device_id" somehow

supports Apple's construction.  Ex. FF (Houh) at ¶73.  But a device_id, which may "identif[y]" the particular mobile device sending the request" for determining how to format data differently (e.g., for a cell phone versus a PC), says nothing about the definition of "token."  '771, Col. 6-33-43.  To the extent Apple argues a "device_id" identifies a device and a "token" identifies a user, that is contradicted by the intrinsic evidence noted above and disclosure of a "user id" in the specification as identifying a user. '771, Col. 9:20-32.

### 3.   "receiving a token issued by an intermediary server"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "receiving a token issued by an intermediary server" ('771, claims 1, 14, and 26) | "receiving a token created by an intermediary server" | "receiving a token sent from an intermediary server" |

The term "receiving a token issued by an intermediary server" requires creation and not just sending as Apple proposes.  Apple's construction fails for several reasons.

First, the claim language indicates "issued by" does not mean merely sent by.  In all ten instances in the claims of both patents where sending is conveyed, the term "transmit" or "transmitting" is used.  '771, claims 1, 14, 26; '476, claims 1, 13, 23, 33.  In fact, the claim element following the term at issue is "<u>transmitting</u> a transaction message comprising payload data to the intermediary server."  If the Applicant merely wanted to convey "sending," he would have used the terminology "receiving a token *transmitted from* an intermediary server," consistent with its terminology everywhere else in the claims.  *Id.*; Jones Decl., ¶39-45.

Second, the prosecution history teaches that "issued by" means created, not "sent."  Jones Decl., ¶39-45.  For example, Noam (U.S. Patent No. 7,203,657), the primary reference in the '771 prosecution history as noted above, teaches that "<u>[a]ccess tokens are created by authorized issuer institutions</u> and bought by users who add them, at a quantity and denomination based on their assessment of the transactions likely to be needed…"  Ex. HH (Noam) at Col. 6:15-19,

5:30-31 ("[a]ccess tokens could include the address of the issuer institution that created it."). Noam also distinguishes the "issuer" (or creator) of a token and a "sender": "[t]he address identification of the institution issuing the access tokens and their presentation for redemption, plus information on sender, recipients, and facilities, will assist in maintaining security against the forgery and duplication of access tokens."  Ex. HH at Col. 7:46-51.

Finally, extrinsic evidence confirms "issued by" means created and not sent.  First, courts in this district have construed "issued" as "created."  *Stambler v. ING Bank, FSB*, 2011 WL 4527648, at *13 (E.D. Tex. Sept. 28, 2011) (construing "the instrument is issued" in a larger phrase as "the instrument being created.").  Moreover, Apple's own cited dictionary, *Webster's*, defines "issue" as "to originate or proceed from any source" or "to be printed or published," which mean creation and not necessarily sending anything to anyone.  Ex. II at 435.

Apple's primary argument is that the specification in one passage describes a server that "issues the mobile device an auth_token after successfully validating the username and password against information in the user database."  '771, Col. 6:21-30.  But this passage is still in the context of token creation, which only occurs in this embodiment after successful registration. Jones Decl., ¶42.  And, to the extent Apple argues that a token must be distributed to a mobile device, that is covered in other language in the claim term at issue, which recites a first computer "receiving a token issued by an intermediary server."

### 4.    The Preamble of Claims 13 and 23 of the '476 patent

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| '476 patent claims 13 and 23 preamble | The preamble is not limiting | The preamble is limiting |

"Generally, the preamble does not limit the claims."  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002).  The preambles of claims 13 and 23 of the '476 patent do not depart from the general rule and are non-limiting.

26

Claim 13 of the '476 patent recites the preamble "[a] method implemented on an intermediary server, the method comprising" and claim 23 of the '476 patent recites the preamble "[a] server for processing a transaction, the server having." There is no reference in the body of the claims to the preambles. Nor was there clear reliance on the preamble in the prosecution history to distinguish the claims. In these circumstances, the preamble is not limiting. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002) (holding that it was error for district court to construe "a method implemented by…" language in the preamble as limiting); *Marrin v. Griffin*, 599 F.3d 1290, 1292 (Fed. Cir. 2010) (finding "label for permitting…" language in preamble not limiting).

Preamble terms that merely name an invention (e.g., "a server") or describe an intended use (e.g., "processing a transaction"), like here, are non-limiting. *Id.*; *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed. Cir. 2002). With respect to claim 23, the claim body recites a structurally complete invention, specifically "a processor configured" with the claimed elements. The "processor" is a structurally complete invention on its own and does not need the "server having" language to be structurally complete. *Am. Med. Sys., Inc. v. Biolitec, Inc.* 618 F. 3d 1354, 1358-59 (Fed. Cir. 2010). Finally, to the extent Apple argues the preamble of claim 23 is something other than "[a] server for processing a transaction, the server having," this is not consistent with the law which provides that "having" is the transition word. *See In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019) (holding that the word "having" "denotes the transition between the preamble and the body").

## F. U.S. Patent No. 9,369,539 ("the '539 patent")

### 1. "delayed for download"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "delayed for download" (claims | No construction necessary | "move the timing for download to a time after the download was |

| 1, 7) | | originally scheduled" |
|---|---|---|

"Delayed for download" is a plain English phrase that requires no construction. Goodrich Decl., ¶50-51.  Apple's proposed construction contradicts the surrounding claim language and improperly seeks to import two limitations—that a download must be "originally scheduled" at a time and that the download must be moved to some later definite time—that exclude preferred embodiments disclosed in the patent.  Goodrich Decl., ¶52-56.  Additionally, the extrinsic evidence Apple relies upon for its construction, which should not be credited over the intrinsic record, does not require the limitations Apple seeks to import.  Goodrich Decl., ¶57-64.  Apple's construction also contradicts Apple's IPR position where it argued no construction was necessary for this term.  Ex. JJ ('539 IPR) at 2-5.

Claim construction begins with the claims.  *Phillips*, 415 F.3d at 1314.  For this term, the Court need go no further.  Apple's construction seeks to read a fixed start time and a fixed end time for the delay into the claims but the claims themselves specify when the download is delayed and the condition that ends the delay.  Goodrich Decl., ¶53, 55.  The relevant portion of claim 1 is reproduced below.  In green, the condition for the recited delay is claimed.  In blue, at least one condition for ending the delay is claimed.

> wherein content selected for download from the server at the second mobile device is **delayed for download** at the first mobile device when the first mobile device is in the power save mode,
>
> wherein the content selected for download at the second mobile device is downloaded at the second mobile device when the second mobile device is not in the power save mode.

'539, Col. 31:49-56.  The claims already specify when the content download is delayed and when that delay ends.  Apple's proposal requiring the download be "originally scheduled" and then moved "to a time" would unduly limit, if not contradict, these positively recited limitations.

The specification further contradicts Apple's proposed construction.   Goodrich Decl., ¶54-56.   Regarding Apple's requirement that a delay move a download "to a time," the '539 patent provides extensive teachings of delays that are not to a specified time, but instead are until a condition is satisfied.  Goodrich Decl., ¶54.  For example, the '539 patent teaches that an event can be delayed "based on priority awareness and/or user activity/application behavior awareness" or until "an event of a higher priority (meeting a threshold or criteria) is detected at the server."  '539, Col. 20:14-31, 29:16-21.   More generally, the '539 patent teaches delaying low-priority power-consuming transactions and executing them opportunistically when a higher-priority task has already invoked the overhead costs associated with using a resource.  '539, Col. 14:35-47, 25:1-46.  Requiring that "delayed for download" be a delay until some fixed time, as opposed to until a condition is satisfied, would improperly exclude all of these embodiments from the scope of the claims.

The specification also contradicts Apple's requirement that a delay must be from some originally scheduled time.  Goodrich Decl., ¶55.  The '539 patent teaches that user-initiated transactions are "unscheduled" rather than "originally scheduled. *See, e.g.,* '539, Col. 5:1-10. And the claims specify the event that results in the delayed download as a user-initiated event. '539, claim 1 ("content selected for download from the server at the second mobile device"); Goodrich Decl., ¶55.  Requiring the delayed download to be one that had been scheduled rather than unscheduled would improperly exclude this teaching from the scope of the claims.

Finally, the extrinsic evidence Apple relies upon—dictionary definitions and a construction of an unrelated patent with a different specification—does not support Apple's construction.  Goodrich Decl., ¶57-64.  None of Apple's dictionaries mention or require that, for something to be delayed, it must have been originally scheduled.  *Id.*; Ex. KK (*Merriam-*

*Webster's*) at 329; Ex. LL (Cambridge) at 241.  And both dictionaries teach that a delay can simply slow an event, rather than move it from one time to another.  *Id.*  And Apple's reliance on a claim construction order from another patent that happened to use the word "delay" is inapposite here, as that claim positively recited "delaying a timing" by requiring "the timing [be] delayed such that the triggers execute within a window of time."  In contrast to the '127 patent's claims at issue in that case, the delay contemplated by the claims of the '539 patent is contingent on a condition rather than a time.

### G.   U.S. Patent Nos. 9,769,176 and 10,243,962 ("the '176 and '962 patents")

### 1.   "registration information"

| Claim Term: | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "registration information" (claims 1, 14) | "information to access a service" | "user information to access a service" |

The parties agree that the construction should include "information to access a service." Apple limits the term to "user information," which contradicts the intrinsic evidence.

First, only SEVEN's construction is consistent with the plain meaning of the term.  Jones Decl., ¶70-76.  Apple offers no expert testimony or evidence that its construction is the plain meaning of the term.

Second, the specification states that "the information about the user and/or the client 110 associated with the user the server 130 originally captured may not provide enough information about the user and/or the client 110 required for the registration for the services associated with the provisioning event."   '176, Col. 13:2-7.   The patents thus teach that the registration information may include information about the client device, such as a cell phone or PDA: "The client 110 may include any type of device, such as a cellular telephone, a personal digital assistant (PDA), a personal computer, etc."  '176, Col. 6:2-4.  The specification further teaches "completing the registration or a portion of the registration with information about the user and

the user device, such as the device 110 discussed in Fig. 1…" '176, Col. 12:20-25.   The disclosure of a preferred embodiment where device information is "registration information" shows Apple's construction is wrong.  *EPOS Techs,* 766 F.3d at 1347.

Third, the claims never require, or even suggest, "registration information" is limited to "user information" and, to the contrary, recite "receive registration information from the client device." '962, Col. 19:52; '176, Col. 19:41-42.

Fourth, Apple's construction contradicts the prosecution history.   For example, the Katsube reference (U.S. Patent App. Pub. No. 2004/0249961) that the Examiner used during the '176 patent prosecution describes an apparatus to connect to the Internet based on "registration information."  *See* Ex. MM (Katsube) at [0018]-[0020].   Katsube further confirms this term is information to access a service and is not limited to user information: "registration information may include a postal code or an address at which the second information processing apparatus is connected to the network."  Ex. MM at [0020].   During the '176 patent prosecution history, the Examiner referred to Katsube's teaching of allowing devices to connect "to the Internet based on the registration information."  Ex. NN (5/16/17 NOA) at 3.   The prosecution history is further evidence that Apple's construction is overly narrow because the Examiner and Applicant understood "registration information" to not be narrowly limited to "user information."  *See Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he record before the [PTO] is often of critical significance in determining the meaning of the claims.").

### H.      U.S. Patent No. 10,039,029 ("the '029 patent")

#### 1.      "a mobile device having an established multiplexed connection for optimizing communications"

| Claim Term: | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "a mobile device having an established multiplexed connection for optimizing | The preamble is not limiting | The preamble "[a] mobile device having an established multiplexed connection for optimizing |

| communications" (claim 1) | | communications" is limiting. |
| --- | --- | --- |

"Generally, the preamble does not limit the claims." *Allen Eng'g*, 299 F.3d at 1346.  This case is no exception.  Where the body of the claim sets out a complete invention, the preamble is "not necessary to give life, meaning, and vitality to the claim" and is therefore not limiting. *Schumer*, 308 F.3d at 1310.  In particular, where the preamble "offers no distinct definition of any of the claimed invention's limitations," it is of no significance and fails to further narrow the claims.  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).  That is the case here.  Goodrich Decl., ¶123-125.

Apple contends that the "the established multiplexed connection" in the body of the claim, referring to "an established multiplexed connection" in the preamble, makes part of the preamble limiting.  Ex. CC (Porter Decl.) at ¶88-91.  However, a claim term in the body of the claim having antecedent basis in the preamble is not sufficient to make the preamble limiting. *Schumer*, 308 F.3d at 10.  For example, in *Schumer*, the Federal Circuit held that the preamble of the claim reproduced below was not limiting despite the preamble providing antecedent basis for five distinct claim terms, which are highlighted below:

> 1. A method implemented by a first computer program running on a computer for transferring information from a digitizer connected to the computer to a second program running on the computer, the digitizer having a surface and a pointer and outputting the position of the pointer on the surface in a coordinate system of the digitizer which coordinate system has a point of origin and has an angle of rotation 1 with respect to the digitizer and has a scale, comprising:
>    …
>    (b) receiving a specification of a point reported by the digitizer to the computer specifying, in the digitizer's coordinate system, the location of the pointer;
>    …
>    (d) providing the coordinates of the second coordinate system for the point to the second program.

*Id.* at 1306.  In holding that the preamble was not limiting, the Federal Circuit explained that "the language of the body of the claim 'sets out the complete invention' in that it provides in detail

the functional attributes of the device that performs the methods." *Id.* at 1310.  As a result, the language of the preamble was "superfluous" even though it provided antecedent basis for terms in the body of the claim.  *Id.*

Here, Apple does not contend that the lone phrase in the preamble upon which it relies, "an established multiplexed connection," is required to define the functional aspects of the claimed device.   Indeed, essentially the same language ("the established multiplexed connection") already appears in the claim.   To not be "superfluous," the language in the preamble would need to further define and limit the features recited in the claim body.  *Id.*

However, Apple does not contend that some language in the preamble defines what an "established multiplexed connection" is—Apple is separately disputing the meaning of that term. Porter Decl., ¶92-96.  Apple's expert, in presenting his view of how a POSITA would understand the term, neither referred to nor relied on the preamble of claim 1.  *Id.*  Dr. Goodrich, Plantiff's expert, likewise did not refer to or rely on the preamble of claim 1 in setting out his opinions on the meaning of "established multiplexed connection."  Goodrich Decl., ¶126-131.

### 2. "established multiplexed connection"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "established multiplexed connection" (claims 1-2, 12-13) | Plain and ordinary meaning; to the extent construction is necessary "connection used to send or receive messages for two or more applications" | "a single, proxied connection for transmission of data from multiple applications" |

"Established multiplexed connection" requires no construction and should be given its ordinary meaning, consistent with its use in the patent.  Goodrich Decl., ¶131.  The patent does not expressly define "established multiplexed connection" or "multiplexed connection" or disavow the plain meaning of either phrase.  Goodrich Decl., ¶128-129.  Apple's construction is inconsistent with the plain meaning and should be rejected.  Goodrich Decl., ¶126-131.

Apple's expert identifies no express definition of "established multiplexed connection"

and no disavowal that would limit the claims as Apple proposes. Ex. CC (Porter) at ¶92-96. Apple's expert also points to no extrinsic evidence that would support his construction. Ex. CC (Porter) at ¶92-96. Instead, Apple and its expert attempt to import implementation details from the specification or elsewhere into the claims. The Court should reject these attempts.

Apple's construction appears to (1) impose a negative limitation on the claims, limiting a device to a single multiplexed connection; (2) introduce an undefined phrase "proxied connection" to import the specification's use of proxies into the claims; and (3) require that the connection be used to transmit, rather than receive, data. None of these limits are appropriate.

First, regarding the "single" connection requirement proposed by Apple, it is unclear what, other than confusion, this limitation adds. Both claim 1 and claim 12 are "comprising" claims, so limiting either claim to a single multiplexed connection would be inappropriate. "Comprising is the standard transition term used to make clear that the claim does not preclude the presence of components or steps that are in addition to, though not inconsistent with, those recited in the limitations that follow." *Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, slip op. at 23 (Fed. Cir. 2020). Both claim 1 and claim 12 also affirmatively recite a "second connection" other than the multiplexed connection, so if "single" is meant to preclude additional non-multiplexed connections it contradicts the claim language. If all that is meant by "single" is that there is at least one such connection, that object is accomplished by the presence of "a," and "single" is superfluous.

Second, Apple's suggestion that a "proxied" limitation should be read into the claims because that is how the specification teaches establishing a multiplexed connection contradicts long-established principles of claim construction. As the Federal Circuit warned in *Phillips*, "[t]o avoid importing limitations from the specification into the claims, it is important that the

purposes of the specification are to teach and enable those of skill in the art to make and use the invention[.]" 415 F.3d at 1323.  However, Apple argues that the multiplexed connection must be a "proxied connection" because the '029 patent enables communicating over an established multiplexed connection through the use of proxies.  Ex. CC (Porter) at ¶93.  However this teaching no more requires that the claimed established multiplexed connection use proxies than the teaching of steel baffles requires all baffles be made of steel. *Phillips*, 415 F.3d at 1314.

Further, the term "proxied connection" never appears in the '029 specification, despite its extensive discussion of different kinds of proxies.  Apple has also not shown that "proxied connection" is a term of art.  Instead, it appears to be a term coined by Apple or its expert to describe a connection with a proxy at both ends.  Ex. CC (Porter) at ¶94.  Construing a claim to include a term coined by the accused infringer would flip claim construction law on its head— normally it is the *patentee* who acts as his own lexicographer—and will likely lead to further disputes over the meaning of the construction.  Apple's own expert, for example, despite opining about the importance of a proxy to the '029 patent, could not provide a definition of a proxy when asked.  Ex. OO (Porter Depo) at 86:20-88:1.

The prosecution history also counsels against reading Apple's "proxied connection" limitation into the claims.  Apple and its expert point to claims cancelled during prosecution of the '029 patent to argue that the concept of a proxy should be read into the '029 claims.  Ex. CC (Porter) at ¶94.  Even if a claim cancellation during a preliminary amendment had probative value, here the claim containing the concepts Apple seeks to read into the asserted claims was cancelled as part of a preliminary amendment and never examined.  Ex. PP ('029 FH) at SEVEN_APPLE-0659.  As part of the same amendment, the title and abstract of the application were changed.  *Id.* at SEVEN_APPLE-0658.  This suggests that the replacement claims were

different in scope from the original claims, and that the patentee did not intend to limit the claims to the use of proxies.

The declaration and testimony of Apple's expert in this matter further undermines Apple's position. In his declaration, Apple's expert points to the '029 patent's discussion of two pre-existing protocols, WebMUX and SCP, to set up the multiplexed connection in order to support his claim that a multiplexed connection must be a proxied connection. Ex. CC (Porter) at ¶93, 97. However, Apple's expert did not review either protocol as part of forming his opinions in this case. Ex. OO (Porter Depo) at 75:21-77:1. Neither protocol mentions using a proxy, or a "proxied connection." Ex. QQ (WebMux and SCP references); Ex. OO (Porter Depo) at 84:19-85:15. According to Apple's expert, both would use proxies, despite not mentioning proxies, because "what you're doing is funneling all the traffic through these two ends points[.]" Ex. OO (Porter Depo) at 85:14-86:9. Taken together, the "proxied connection" limitation Apple seeks to read into the claim is a term coined by Apple with no basis in the intrinsic record or accepted definition in the art that Apple's own expert cannot cogently define.

Third, Apple's requirement that the "established multiplexed connection" be used for "transmission of data from multiple applications" contradicts both the plain meaning of the term and the teachings of the patent. As an initial matter, a connection generally may be used to send or receive data, so requiring that the claimed established multiplexed connection be used to for transmission of data from multiple applications unduly narrows the scope of the word "connection." Goodrich Decl., ¶130.

Nothing in the patent requires the established multiplexed connection to be used to send transmissions from multiple applications. Instead, the specification suggests that the established multiplexed connection could be used primarily or exclusively for applications to *receive* data.

Goodrich Decl., ¶130; '029, Col. 28:26-36. The patent contemplates the multiplexed connection being established from the server side, suggesting that the server would use the multiplexed connection to transmit data to client applications.  *Id.*  Apple's construction would exclude this embodiment, and, for this additional reason, is not correct.  *Id.*; *EPOS Techs.*, 766 F.3d at 1347.

In view of the above, no construction is necessary.  However, to the extent the Court believes the jury would benefit from a construction of the term "multiplexed," SEVEN proposes "a connection used to send or receive messages for two or more applications," consistent with the ordinary meaning of the term "multiplexed."  Goodrich Decl., ¶131.

### 3.      "activity session"

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "activity session" (claims 1, 4, 11-12, 15, 22) | Plain and ordinary meaning | "pattern of multiple mobile application use by a mobile user that can be 'predicted' by using contextual clues available to a mobile client proxy" |

"Activity session" is a plain English phrase that requires no construction.  Apple relies on a passage from provisional application 61/408,839 ("the '839 application"), but that passage fails to "clearly set forth a definition of the disputed claim term" as required for lexicography.  *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. Feb. 1, 2012); *see* Ex. CC (Porter) at ¶112-113.  The relevant passage is: "As will be described, in some embodiments the present invention is directed to a method for augmenting a distributed proxy-based solution by introducing the concept of an 'activity session.'  An activity session is a pattern of multiple mobile application use by a mobile user that can be 'predicted' by using contextual clues available to a mobile client proxy."  Ex. RR ('839 prov. app) at 2.

But this passage merely provides description of "activity session" for some embodiments.  The '839 application and the '029 patent bear that out.  For example, the '839 application uses "activity session" to refer to past (not predicted) user activity.  It teaches "the Traffic Shaping

Module [301] in the server functions to categorize the activity that is being processed by the server since the last user activity session"). Ex. RR ('839 prov. app) at 10. This is inconsistent with language Apple seeks to use for its construction, which requires an activity session to be something that can be <u>predicted</u>, i.e., something that has not yet happened.

In addition, the '029 patent, like the '839 application, does not use the phrase "activity session" consistently with Apple's proposed construction for all embodiments. Goodrich Decl., ¶132-134. For example, both the '029 patent and the '839 application teach that an activity session can be predicted by the server rather than the client. Goodrich Decl., ¶138; Ex. RR ('839 prov. app) at 12 ("In some embodiments, if an Activity Session is identified by the client….**If identified by the server**…"). In light of the disclosure of additional embodiments in the specification, Apple's passage in the '839 application cannot define "activity session." *MasterObjects, Inc. v. Yahoo!, Inc.*, 2013 U.S. Dist. LEXIS 168296, at *22 (N.D. Cal. Nov. 26, 2013) ("Yahoo! seeks to import a specific limitation from a glossary which is expressly limited to a preferred embodiment. This is not permitted.").

Taken together, the '029 patent and its priority applications fail to provide clear lexicography for "activity session." The term's ordinary meaning should therefore apply.

### 4. **"wherein the data is fetched if the fetching is enabled by the user selection for the application"**

| Claim Term | SEVEN's Construction | Apple's Construction |
|---|---|---|
| "wherein the data is fetched if the fetching is enabled by the user selection for the application" (claims 1, 12) | Not indefinite | Indefinite |

It is Apple's burden to prove by clear and convincing evidence invalidity by indefiniteness. *Nautilus, Inc. v. Biosig Instruments*, 572 U.S. 898, n. 10 (2014). Apple falls well short of meeting this heavy burden. A claim is not indefinite so long as it informs a person of ordinary skill about the scope of the invention with "reasonable certainty." *Id.* at 910. As

illustrated by Dr. Goodrich, the meaning of the disputed phrase in the context of the claim to a person of ordinary skill is clear.  Goodrich Decl., ¶140; Ex. SS (Goodrich Depo) at 139:19-140:15.  The "wherein" clause in dispute is one of three wherein clauses that further limit the "fetching data" limitation, of which they are a part.  *Id*.  The clause Apple contends is indefinite makes clear that the "fetching data …" step is contingent upon a user selection enabling fetching for the application whose data is to be fetched.  *Id*.

Apple's argument that the claim term at issue is indefinite is inconsistent with its IPR positions, where Apple and its expert alleged the claims were invalid based on several prior art references.  *See, e.g.*, Ex. TT ('029 IPR) at 31-32, 60; Ex. UU ('029 IPR Corner Decl.) at 72-73, 109-110; *see Sonix Tech. v. Publications, Int'l*, 844 F.3d 1370, 1380 (Fed. Cir. 2017) (finding a term definite, in part, because "[t]he parties' experts also had no difficulty in applying 'visually negligible'" to prior art).

Apple's expert asserts that the term is indefinite because the claims allegedly "could have been written" in a "simpler" way.  Ex. CC (Porter) at ¶120-121.  But even Apple's expert refers to the claim limitation as having a "common sense interpretation" that "fetching does not occur if fetching is not enabled."  *Id*.  *Nautilus* only requires "reasonable certainty" regarding the scope of a claim.  Here, even Apple's expert agrees there is a "common sense interpretation" that works.  Under *Nautilus*, that is the end of the inquiry.

## II.   PROCESSOR TERMS – THE '127, '056, '734, '550, '619, '914, '771, '476, '539, '029, AND '986 PATENTS

Apple sweepingly argues that thirteen "processor" terms across eleven of the patents-in-suit render the claims indefinite.  At bottom, Apple identifies various terms with the word "processor" (e.g., "processor configured to") and argues that i) each term invokes 35 U.S.C. 112, 6th paragraph ("112(6)"), ii) the "function" is the entire body of the claim, and iii) the "structure"

is indefinite because there allegedly is no corresponding structure in the specification for any of the 100 or so claim elements. Apple's argument fails for several reasons.

### A. Apple's Untimely "Processor" Arguments Are Waived

As described in more detail in separate briefing in opposition to Apple's motion to supplement its invalidity contentions, Apple's untimely indefiniteness arguments on these thirteen terms are waived. *See* Dkts. 83, 90. Apple was required to identify its indefiniteness arguments in its invalidity contentions. *Id.* Rather than do so, Apple deliberately withheld as much information about its indefiniteness contentions as possible at every turn, only first identifying these theories in a supplemental P.R. 4-1 response and first providing any explanation of these theories with its P.R. 4-3 statement and expert declarations. *Id.* Accordingly, the Court should reject these untimely arguments outright.

### B. Apple's Arguments Are Defective On Their Face

Apple's arguments are also defective on their face. Apple never identifies what claim language it contends is in means-plus-function format. Apple's identified terms, such as "processor configured to," are entitled to plain and ordinary meaning. *See, e.g., Solocron Media, LLC v. Verizon Commc'ns Inc.*, No. 2:13-CV-1059-JRG-RSP, 2015 WL 1011310, at *12 (E.D. Tex. Mar. 5, 2015) (finding "configured to" is entitled to its ordinary meaning); *Variant Holdings LLC v. Z Resorts LLC*, 2013 U.S. Dist. LEXIS 67943, *91-95 (E.D. Tex. May 9, 2013) (finding no construction necessary for "processor"). To the extent Apple believes that some portion (or all) of the claim language invokes means-plus-function, its claim term should not have been "processor configured to" but rather "processor configured to … [each claim element that is in 112(6)]." Based on the terms before the Court, e.g., "processor configured to," there is nothing for the Court to construe.

In addition, Apple's 112(6) argument is defective on its face for many terms, where the

claim is not directed to a "processor."  For example, claim 1 of the '771 patent recites:

> 1.   A <u>non-transitory computer-readable storage medium storing instructions</u> to be implemented by a first computer having a processor, wherein the instructions, when executed by the processor, cause the first computer to perform steps comprising:

This claim language is directed to a "non-transitory computer-readable storage medium storing instructions."  That these instructions are "to be implemented by a first computer having a processor" does not make a "processor" what the claim is directed to, let alone suggest the Applicant was intending to use the term "processor" in a means-plus-function format.

Similarly, claim 51 of the '619 patent and claim 42 of the '127 patent recite:

> 51.    A <u>non-transient computer-readable medium</u> containing program instructions for causing a device to perform a method, the method comprising:

> 42.    A <u>non-transitory computer-readable storage medium</u> storing instructions that when executed by a processor causes the processor to:

Again, the claims are directed to a "non-transient computer-readable medium."  The term "processor" used in this way does not invoke 112(6).  *See Kit Check, Inc. v. Health Care Logistics, Inc.*, 2019 U.S. Dist. LEXIS 148398, at *25 (S.D. Ohio Aug. 30, 2019) (denying 112(6) argument for a claim directed to "a non-transitory, computer readable medium storing" instructions executable by a processor because the term 'processor,' used in this way, <u>does not invoke means-plus-function</u> claiming.").  Accordingly, Apple's 112(6) argument for at least claim 1 of the '771 patent, claim 51 of the '619 patent, and claim 42 of the '127 patent should be rejected for this additional reason.

**C.     Apple Does Not Overcome the Presumption that 112(6) Does Not Apply**

To begin with, none of the "processor" terms include the language "means for."  Accordingly, the presumption is that 112(6) is *not* invoked.  *See Personalized Media Commc'ns,*

*LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998).   Apple falls well short of overcoming this presumption.

"[N]umerous precedent from this District find[] the term 'processor' is not a means-plus-function term."  *Realtime Data, LLC v. Rackspace US, Inc.*, 2017 U.S. Dist. LEXIS 92131, at *46-47 (E.D. Tex. Jun. 14, 2017).[9]  For example, the *SyncPoint* court held that 112(6) does not apply to "processor" for several reasons, including that "processor connotes structure.'"  2016 U.S. Dist. LEXIS 677 at *59-60 (citing technical dictionaries).[10]  In addition, the *SyncPoint* court held that the claim at issue recited "the objectives and operations of the processor in the 'processor . . . for' limitation."  *Id.*   Likewise, in *Cypress Lake*, the court held that certain "processor configured for…" terms were not subject to 112(6), noting "the claim language provides a description of how the processor is specifically programmed to operate."  2019 U.S. Dist. LEXIS 79752, at *187.  The court noted that the claim "describes the structural interactions of the processor, the screen, the input device, and the memory."  *Id.*

---

[9] *See also Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 2019 U.S. Dist. LEXIS 79752, at *181-191 (E.D. Tex. May 10, 2019) ("processor configured for . . ." not 112(6)); *Optis Cellular Tech., LLC v. Kyocera Corp.*, 2017 U.S. Dist. LEXIS 18191, at *23-26 (E.D. Tex. Feb. 8, 2017) ("processor" term not 112(6)); *Panoptis Patent Mgmt., LLC v. Blackberry Ltd.*, 2017 U.S. Dist. LEXIS 16650, at *18-19 (E.D. Tex. Feb. 7, 2017) (same); *Cellular Communs. Equip. LLC v. AT&T*, 2016 U.S. Dist. LEXIS 174666, at *14-17 (E.D. Tex. Dec. 18, 2016) (same); *Advanced Mktg. Sys., LLC v. CVS Pharm., Inc.*, 2016 U.S. Dist. LEXIS 58472, at *19-20 (E.D. Tex. May 3, 2016) (same); *SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, 2016 U.S. Dist. LEXIS 677, at *51-62 (E.D. Tex. Jan. 5, 2016) ("a processor . . . for processing" not 112(6)); *Smartflash LLC v. Apple Inc.*, 2015 U.S. Dist. LEXIS 91669, at *3 (E.D. Tex. Jul. 7, 2015) ("processor" not 112(6)).

[10] The court noted that the IBM Dictionary of Computer Science (10th ed. 1994), for example, "defin[es] 'processor' as '(1) in a computer, at a functional unit that interprets and executes instructions.  A processor consists of at least an instruction control unit and an arithmetic and logic unit.  (T)(2) One or more integrated circuits that process coded instructions and perform a task.'")  *Id.* at *59-60.  Other technical dictionaries similarly define "processor" as structure. Jones Decl., ¶89; Ex. VV (*Hargrave's*) at 410, Ex. WW (*Chambers*) at 918, Ex. XX (*IEEE*) at 872, Ex. YY (*IBM*) at 533.

Like in *SyncPoint* and *Cypress Lake*, the claim language here, as well as evidence from a person of skill in the art, confirms that the claims at issue recite the objectives and operations of the processor and that the processor interacts with other structural elements of the claims. Specifically, the claims describe a "processor" as structure that interacts structurally with other components, including a "memory" or a "storage medium" ('127, claims 33 and 42; '029, claim 1), "host" and a "battery" ('550, claims 15 and 32), a "first computer" and a "second computer" ('476, claim 23), an "intermediary server" ('476, claim 33; '771, claims 1 and 26), "first device" and a "second device" ('914, claim 11) and a "first device" or a "second device" ('986, claims 1, 12, and 23), "remote device" ('619, claim 22 and 51), a "memory" and a "radio" ('734, claim 1; '539, claim 1; '056, claims 1 and 19). *See* language of cited claims; Jones Decl., ¶¶92-93, 96-98; Smith Decl., ¶50-51; Goodrich Decl., ¶40. A person having ordinary skill also at the time of the patents would have also understood the structural arrangements of the processor in light of the objectives and operations recited in the claims with "processor" terms. *See* claim language of the respective claims; Jones Decl., ¶93, 95, 100; Smith Decl., ¶50-51; Goodrich Decl., ¶40.

In addition, the patent specifications expressly state that the "processor" terms do not invoke 112(6). For example, the specifications state that "[a]ny claims intended to be treated under 35 U.S.C. 112, ¶6 will begin with the words 'means for.'" *See, e.g.,* '127, Col. 23:52-54, '056, Col. 43:45-47, '029, Col. 43:47-49, '539, Col. 31:31-33, '734, Col. 49:16-18. This intrinsic evidence further confirms the Applicant did use "processor" as a nonce term. The specifications further describe the "processor" terms as structure interacting with other structure, like memory, a battery, a display screen, a server, and other structural components. Jones Decl., ¶91, 94; Smith Decl., ¶46-48; Goodrich Decl., ¶33.

Further, Apple's own actions contradict its argument. For example, Apple inconsistently

argues in at least **ten separate IPRs** on patents-in-suit that the "processor" terms do not invoke 112(6). *See, e.g.,* Ex. ZZ ('734 IPR) at 4 ("Petitioner submits that, in this proceeding, 'processor…configured to' (claim 1) is properly interpreted according to its plain and ordinary meaning."); Ex. TT ('029 IPR) at 18-20; Ex. Z ('127 IPR) at 6; Ex. JJ ('539 IPR) at 2-5. Apple's counsel in the Google case also did not assert that any of the "processor" terms there, including the "processor" terms for the '127 patent or "processor" terms in related patents, invoked 112(6). Ex. AAA (JCCS in *SEVEN v. Google*) at 12-19. In fact, Apple's counsel made contradictory statements in the prior case. For example, in an IPR on U.S. Patent No. 8,811,952, a related patent to the '550 patent-in-suit, Apple's counsel and its expert asserted that the term "processor" did not invoke 112(6) and was a "well-known" structure to a person of ordinary skill: "[A]s of the Critical Date of the '952 patent, <u>use of a processor was an ordinary and predictable configuration</u> for a mobile communication terminal and a POSITA would have found it obvious to implement Hasegawa's mobile communications terminal 510 with a processor." Ex. BBB ('952 IPR) at 13; Ex. CCC ('952 IPR Wenisch Decl.) at 41-44.

Apple's only cited authority, *St. Isidore Research, LLC v. Coamerica, Inc.*, itself notes that "the Court has typically found 'processor' to connote sufficient structure to avoid [112(6) claiming]." 2016 U.S. Dist. LEXIS 126866, at *14-15 (Sept. 19. 2016). Moreover, *St. Isidore* is the only known case in this district finding "processor" in 112(6), and it has been distinguished by dozens of cases. *See* fn. 9. For example, the *Realtime Data* court held that "St. *Isidore* is distinguishable. In *St. Isidore*, only two portions of the claim referred to the processor, and they did so in purely functional language." 2017 U.S. Dist. LEXIS 92131, at *46-47. *St. Isidore* is easily distinguishable here. Unlike SEVEN, the plaintiff in St. *Isidore* presented no evidence that the two "processor" terms at issue recited the objectives and operations of the processor or

interacted with other structural components.  *See St. Isidore*, No. 2:15-cv-01390, Dkt. 148, at 25-28 (E.D. Tex. May 31, 2016).[11]   In contrast, the claims at issue here generally refer to the "processor" for all of the claim body (not a short functional phrase as in *St. Isidore*), recite the objectives and operations of the processor, and recite a processor as structure that interacts with other structural elements.  *See* language of claims at issue; Jones Decl., ¶¶92-93, 96-98; Smith Decl., ¶50-51; Goodrich Decl., ¶40.  Accordingly, the Court should follow the "typical practice" in this district that the term "processor" does not invoke 112(6).  *Id.*

For at least these reasons, "processor" is not a nonce term, 112(6) does not apply, and the "processor" terms should be given their plain and ordinary meaning.

### D.    The Claims Are Not Indefinite

As explained above, 112(6) does not apply, and the "processor" terms should be given their plain and ordinary meaning.  In the event the Court finds the presumption against 112(6) is overcome, the Court would then need to consider whether Apple can prove by clear and convincing evidence that the claims are indefinite for failure to disclose sufficient corresponding structure in the specification.  *St. Isidore*, 2016 U.S. Dist. LEXIS 126866, at *14-15.  If the Court finds it needs to address this issue, SEVEN respectfully requests that the Court first order supplemental briefing so SEVEN can identify where the structure is disclosed in the specifications.  In light of Apple's untimely disclosure, the pending motion practice for the "processor" terms, and this brief's page limits, SEVEN should not be forced to identify structure in the specification for 100 claim terms, which is not efficient, fair, or practical.

### III.    CONCLUSION

For the reasons noted above, the Court should adopt each of SEVEN's constructions.

---

[11] The two "processor" terms at issue in *St. Isidore* were: "a processor configured to identify a second device associated with the account" and "a processor configured to verify the authenticity of the account access request based on the response."  *Id.*

Dated:  February 3, 2020

Respectfully submitted,

/s/      Samuel F. Baxter
Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer Truelove
jtruelove@mckoolsmith.com
MCKOOL SMITH, P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
Telephone:  (903) 923-9000
Facsimile: (903) 923-9099

Kevin Burgess
kburgess@mckoolsmith.com
Seth R. Hasenour
shasenour@mckoolsmith.com
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone:  (512) 692-8704

Kevin Schubert
kschubert@mckoolsmith.com
MCKOOL SMITH, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001
Telephone: (212) 402-9400

Eric Hansen
ehansen@mckoolsmith.com
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:  (214) 978-4000

**ATTORNEYS FOR PLAINTIFF
SEVEN NETWORKS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on February 3, 2020.

/s/ *Kevin Schubert*
Kevin Schubert